UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION – BAY CITY

IN RE:

    GENE M. KIRVAN,
        Debtor.
_____/

CAMP INN LODGE LLC,
        Plaintiff/Counter-Defendant,

v.

GENE M. KIRVAN,
        Defendant/Counter-Plaintiff,
_____/

Case No. 17-22470-dob
Chapter 13 Proceeding
Hon. Daniel S. Opperman

Adversary Proceeding
Case No. 17-2120-dob

OPINION

Introduction

Plaintiff, Camp Inn Lodge, LLC ("Camp Inn"), claims that Defendant, Gene Kirvan, took $59,752.45 while he was an employee of Camp Inn. Accordingly, it argues that this amount should be trebled, that statutory attorney fees and costs should be awarded to Camp Inn and that this Court should except this amount from discharge. Mr. Kirvan denies these allegations and argues that any amount that he may owe is discharged. For the reasons stated in this Opinion, the Court finds and holds that Camp Inn has met its burden of proof as to its Section 523(a)(4) and (a)(6) claims.

Jurisdiction

This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1) and E. D. Mich. LR 83.50(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts). The United States Supreme Court has determined that so long as the parties knowingly and voluntarily consent,

1

Article III allows bankruptcy judges to adjudicate certain claims. *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).

Findings of Fact

The Court makes the following findings of fact based upon the testimony of 8 witnesses and 88 Exhibits.

The trial of this adversary proceeding, which spanned six days, is a tale of two theories. Camp Inn's first theory is that the testimony and exhibits demonstrate that Mr. Kirvan took $59,752.45 from Camp Inn over the course of approximately 1 ½ years by pulling cash receipts from the hotel operations of Camp Inn and pocketing that money directly. Per Camp Inn, the testimony of lay witnesses sets the foundation for this theory and the testimony of an expert witness, Cynthia Scott, a certified public accountant and certified fraud examiner, establishes the liability of Mr. Kirvan. Camp Inn's second theory examined and explored the reported income and expenses of Mr. Kirvan over the same period of time to demonstrate that Mr. Kirvan was living well beyond his known income means and therefore must have taken cash from Camp Inn. Mr. Kirvan's defense to these claims necessarily reacted to each theory separately.

Introduction of Parties and Circumstances

Deborah Wiltse is the sole member of Camp Inn. For many years she was involved in the restaurant business with her ex-husband and she has years of experience running a restaurant, Wiltse Brew Pub & Family Restaurant. During this time, Ms. Wiltse befriended Monsignor James Brucksch, the Catholic Priest for her church. As was Ms. Wiltse's family tradition, she included Mons. Brucksch in many family events, including vacations. Ms. Wiltse's marriage ended in divorce, and she received a settlement with her ex-husband of $150,000.00 that paid her a monthly

income in which to live. Ms. Wiltse continued to work at the family business, and prior to her divorce she hired Mons. Brucksch as a part-time bookkeeper.

Shortly after her divorce was finalized, Mr. Kirvan entered her life. Mr. Kirvan was likewise in the midst of a divorce proceeding which was finalized in 2011. Mr. Kirvan is a man of many talents. He is a carpenter, a fishing guide on both Lake Huron and various rivers in Northern Michigan, and a manager of hotels. Prior to meeting Ms. Wiltse, he managed a local Days Inn and did various carpentry and fish guiding projects on the side. He moved in with Ms. Wiltse in 2011.

Camp Inn Lodge Opportunity

After her 2012 divorce, Ms. Wiltse continued to work at the family restaurant but was increasingly uncomfortable doing so. She started looking for an opportunity to work elsewhere and discovered that a local hotel and restaurant, Woodland Pines, could be acquired. Unfortunately, Ms. Wiltse did not have a substantial amount of money to make a down payment, but she was offered extremely favorable terms by the current owner because he wished to get out of this business. Ms. Wiltse felt extremely comfortable that she could run the restaurant portion of the business, but she had no experience in running a hotel. Mr. Kirvan, however, had significant experience running two local motels and persuaded her that he could manage the hotel operations and she could run the restaurant. After much discussion, the two of them agreed to enter into this enterprise and did so in 2014.

The parties spent significant time at trial arguing whether Mr. Kirvan was a 50% owner of Camp Inn. Camp Inn, through Ms. Wiltse, vehemently denies his assertions and for the most part the paperwork supports her position. First, an original draft of the purchase agreement did include Mr. Kirvan as a purchaser, but his name was quickly taken off all documents at her direction.

Second, there is no evidence that Mr. Kirvan advanced any monies whatsoever to acquire Camp Inn or form a new limited liability company. Third, Mr. Kirvan's criminal background precluded him from owning a membership interest in an organization that had a liquor license. While it is true that Mr. Kirvan produced evidence that Ms. Wiltse referred to him as her "partner" either directly or indirectly, the preponderance of the evidence weighs heavily in favor of Ms. Wiltse's position and against Mr. Kirvan's.

Ms. Wiltse and Mr. Kirvan began operating Camp Inn in the spring of 2014. During this time, Ms. Wiltse worked full-time at Camp Inn, but Mr. Kirvan split his time with his then current employer, as well as being a fishing guide. During this time, Mr. Kirvan did some remodeling of Camp Inn but utilized his former employer's account to procure the remodeling resources. Although his former employer's account was used, Camp Inn paid for these resources. Additionally, Mr. Kirvan used some countertops, sinks, fixtures, and keys that he claims were given to him by the previous owner of his previous employer, but that a dispute arose afterwards as to whether these items were actually given to Mr. Kirvan. As a result, Mr. Kirvan pleaded nolo contendere to a criminal charge in state court.

Operation of Camp Inn Lodge Hotel Division

Camp Inn is a classic Northern Michigan lodging enterprise that offers overnight accommodations. Guests check into the hotel at a front desk and make arrangements to pay for their hotel room either with cash, check, or credit card. Quite often, these rooms are reserved ahead of time and Camp Inn utilizes a computer program commonly known as the Room Master program.

Turning to the check-in and payment process, the front desk clerk takes care of the routine confirmation of the rooms, guests and reservations, the exchange of information and keys to a

room, and the finalization of payment terms. If a credit card is used, the credit card information is taken and retained on a short-term basis. If a check or cash is the form of payment, the check or cash is received and then placed in an envelope. Each front desk clerk works approximately 8 hours, so for any given day there would be three envelopes, one for each front desk clerk. The envelope containing all of the payment terms or mediums is placed in the package along with the report indicating the particular room rented to the customer and other vital details.

Initially, Mons. Brucksch received the daily envelope and made the necessary arrangements to input the information in Camp Inn's computer, as well as prepare the deposit for the bank. Mons. Brucksch would take the information, prepare the necessary deposit slip and then present this package to the bank for deposit of checks and cash. Approximately 1 ½ months into this process, Mr. Kirvan expressed a great amount of frustration with Mons. Brucksch because he, per Mr. Kirvan, was having difficulty managing all of these tasks. Accordingly, he persuaded Ms. Wiltse to tell Mons. Brucksch that the initial daily packet should be delivered to Mr. Kirvan, who in turn would input the necessary information and then give the check, cash, and credit card information to Mons. Brucksch to process for a deposit. From mid-2014 through mid-2016, this protocol was in place. It is during this time that Camp Inn claims that Mr. Kirvan began slipping cash out of the daily envelopes and pocketing this money. Mr. Kirvan denies doing so.

Per Camp Inn, Mr. Kirvan would receive the daily package and prepare a slip for Mons. Brucksch to review. Since the credit card payments were made directly through the credit card processing system, Mr. Kirvan could not take any of these funds. The same is true for checks made payable to Camp Inn. But cash could be, and in Camp Inn's view, was taken by Mr. Kirvan. As its view goes, Mr. Kirvan would, from time to time, take cash out of the daily packages, jot

down a different number for Mons. Brucksch to deposit, and then hand the information to Mons. Brucksch to complete the process.

By early 2016, the personal relationship between Mr. Kirvan and Ms. Wiltse deteriorated. Mr. Kirvan admitted that he was openly utilizing online dating sites while still living with Ms. Wiltse because he could see that this relationship would soon end. Also, he knew that the divorce payments to Ms. Wiltse would soon be completed. Accordingly, Mr. Kirvan arranged to purchase a separate house and began renovations on that house, all without the knowledge of Ms. Wiltse. This came to a head when Ms. Wiltse began learning of some of these developments and she resolved to fire Mr. Kirvan. After doing so, she began examining the hotel receipt records and saw that the expected revenues and the actual revenues did not match up. She brought in her accountant, who assigned Ms. Scott to investigate the possibility of embezzlement.

Testimony of Cynthia Scott, CPA & CFE

Ms. Scott is a certified public accountant and certified fraud examiner. She has requisite experience and knowledge in fraud and embezzlement investigations and began to review the records of Camp Inn. In doing so, the task before her was formidable because the records of Camp Inn were not well kept. After Mons. Brucksch made the deposit at the bank, the necessary deposit information was placed in the daily package and then sealed and placed in a box in the open office area shared by Ms. Wiltse, Mr. Kirvan, and others employed by Camp Inn. After collecting a month of daily packages in a box, the box was then placed in a more secluded area at an onsite location. When Ms. Scott began reviewing the individual packages, she saw a huge disconnect between the amount actually reported as cash receipts in the Room Master program and the amounts deposited with the bank. Also, many of the daily sheets maintained by the individual front desk clerks were missing, with a majority of the missing sheets involving days where cash

was supposedly received by the hotel clerk. In her professional opinion, Ms. Scott believed that she could not rely upon the actual source data, that is the front desk clerk's daily reports to reconstruct the receipts of Camp Inn. Instead, Ms. Scott had to try to reconstruct the actual cash receipts by resorting to the Room Master program. In doing so, Ms. Scott concluded that she could accurately reconstruct the cash receipts that should have been deposited on behalf of Camp Inn, but which were not. Exhibit 3 is her report that details her analysis and concludes that $59,752.45 was missing.

Ms. Scott, as part of her investigation, interviewed various employees of Camp Inn and attempted to reconcile the reports that she was given with their statements. In doing so, she realized that Mr. Kirvan was the first and only person who could have made the necessary modifications to the deposit slip filled out by Mons. Brucksch and take the cash received by the front desk clerk. For example, Mr. Kirvan was the first person to receive the daily packages, rewrite the information, and take money from the packet before giving it to Mons. Brucksch for deposit. Second, various employees told her that they noticed the daily sheets prepared by the front desk clerks sometimes were thrown away by Mr. Kirvan but that no one brought that to Ms. Wiltse's attention at the time he did so. Per Ms. Scott's review and testimony, the amounts written by Mr. Kirvan on the deposit report matched the amounts received by Mons. Brucksch and deposited with the bank, which left Mr. Kirvan as the only possible person who could have taken cash under this scenario.

The challenge facing Ms. Scott, however, was to establish the amount actually taken by Mr. Kirvan. The source documents were either destroyed or not available, so Ms. Scott began examining the Room Master program to see if she could reconstruct the cash receipts. In doing so, she noted a number of variations between the Room Master report of cash receipts and the

amount actually deposited by Mons. Brucksch. From her review of the Room Master program, she concluded that Mr. Kirvan took the amount claimed by Camp Inn.

Camp Inn's Claim of Direct Evidence of Taking of Money by Mr. Kirvan

Ms. Scott also examined the curious case of Cora Hewitt. Ms. Hewitt works as a waitress for the restaurant portion of Camp Inn. Because of some family issues, Ms. Hewitt did not have a place to stay and therefore became a long-term tenant of Camp Inn in one of its hotel rooms. Ms. Hewitt does not have a credit card, so she paid her rent with cash on a sporadic basis. When the records for her room are closely examined, there is a discrepancy between the amounts she paid per the Room Master program and the amounts reported by Mr. Kirvan as a cash payment that was subsequently deposited by Mons. Brucksch. Per Ms. Scott's analysis, this is direct confirmation that there was slippage between the cash actually received by the front desk clerk and reported initially by that clerk compared to the amount actually reported by Mr. Kirvan for deposit by Mons. Brucksch to the bank.

In particular, Exhibits 19 and 25 evidence that Ms. Hewitt paid cash of $50 on August 15 that was noted by the Room Master program, as well as the drop sheet. Mr. Kirvan reported a $50 deposit but as a credit card and therefore no cash was deposited by Mons. Brucksch on that day. So, by analogy and extension, for other accounts and entries Ms. Scott concludes Mr. Kirvan took $59,752.45.

Finally, Ms. Scott testified that after Mr. Kirvan left in July of 2016, the cash deposits reported by Room Master matched the deposits actually made by Mons. Brucksch at the bank. Moreover, the credit card payments reported by Room Master matched the actual credit card receipts reported by the bank.

Mr. Kirvan vehemently disputes these arguments and claims and points out a series of weakness in the Room Master program. Initially, he points out that the Room Master program is designed more to manage the day-to-day use of a hotel room, to coordinate when a hotel room is being reserved, used, and when it needs to be cleaned. Per Mr. Kirvan, the Room Master program was not designed to track actual receipts and does a poor job in doing so. Many of the examples given by Mr. Kirvan support his general contention that there was and is slippage between what is actually happening in a hotel, as opposed to the Room Master program view of reality.

Also, Mr. Kirvan pointed out that there is no direct testimony that he threw away any daily sheets and that he does not recall doing so. Although others testified that they saw various daily sheets in the trash can utilized by Mr. Kirvan, he rebuts that testimony by indicating that many people, including Ms. Wiltse, Mons. Brucksch, servers, housekeepers, and the front desk personnel all had access to this area and the daily packages, as well as himself. Moreover, Mr. Kirvan makes the practical point that if he were to destroy evidence as described by others, he surely would not have done it in open sight as claimed by them. Finally, to emphasize the point, Mr. Kirvan testified that many people had access to the records after he finished with them on a daily basis and certainly after he left Camp Inn in 2016.

What Mr. Kirvan does not explain, however, is that while certain cash receipts documents were missing, others remain.

Comparison of Mr. Kirvan's Income and Expenses

Camp Inn buttresses its first theory by examining the expenses incurred by Mr. Kirvan and comparing those expenses with his income from tax returns from 2014-2017. This nuanced process can be summarized as follows:

9

First, Camp Inn started with the divorce pleadings filed by Mr. Kirvan, notably various representations made by him of his assets, including cash at the time his divorce was filed. Next, Camp Inn took the actual income reported by Mr. Kirvan in his tax returns, as well as the sale of various assets that generated cash but were not necessarily reportable to the IRS. After reaching the conclusion of the amount of cash available to Mr. Kirvan, Camp Inn then reviewed various expenses, as reported in bank statements and other known expenses to arrive at an amount spent by Mr. Kirvan during the appropriate period of time. Also added into this calculation was the purchase of a different home by Mr. Kirvan and remodeling costs of that home. Exhibit 42 demonstrates this type of analysis.[1]

This analysis starts with income Mr. Kirvan received in 2014 of $26,318.00 from his wages and charter fishing income, along with miscellaneous income from his PayPal account of $1,671.72. Using Exhibit 42 as a guide, Mr. Kirvan's known income and expenses are summarized as follows:

|                | 2014        | 2015        | 2016        |
|----------------|-------------|-------------|-------------|
| Income         | $26,318.00  | $45,909.00  | $36,732.00  |
| PayPal         | $1,671.00   | $2,981.00   | $4,600.00   |
| Total Deposits | $28,080.00  | $41,716.00  | $50,900.00  |
| Known Expenses | $24,575.00  | $45,238.00  | $52,121.00  |

In addition, Camp Inn did not take into account expenses for food, clothing, gas, entertainment or personal care because there were no documents to support the actual amount spent, although Mr. Kirvan must have spent some money on these items.

---

[1] Exhibit 42 was offered as a demonstrative exhibit to provide the parties and the Court a roadmap through the various exhibits and testimony of the witnesses. The Court does not adopt the facts and numbers stated in this exhibit and instead relies on its independent review of the admitted exhibits and allowed testimony.

In response, Mr. Kirvan states that he started off with slightly more cash than attributed by Camp Inn and that he kept larger amounts of cash in a safe but never told anyone that he kept those large amounts of cash. Also, Mr. Kirvan disputes certain parts of the analysis by Camp Inn and indicates that he from time to time would receive tips and other income from the guests he hosted on various fishing trips.

Moreover, Mr. Kirvan testified that he ate his meals at Camp Inn, so he had little to no food expense and that he incurred minimal clothing, entertainment or other personal care expenses.

## Statement of Authorities

### 11 U.S.C. § 523(a)(4) - Embezzlement and Larceny

"[F]or Section 523(a)(4) purposes, federal common law, rather than state law, controls the meaning of these terms." *Williams v. Noblit (In re Noblit)*, 327 B.R. 307, 311 (Bankr. E.D. Mich. 2005). The burden is upon the plaintiff to demonstrate the debt is nondischargeable by a preponderance of the evidence. *Atassi v. McLaren (In re McLaren)*, 990 F.2d 850, 852 (6th Cir. 1993).

"Federal common law defines embezzlement as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.'" *Noblit*, 327 B.R. at 311 (quoting *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996)).

"An essential element of the crime [of embezzlement] is a felonious or fraudulent intent." *People v. Douglass*, 293 Mich. 388, 391, 292 N.W. 341 (1940) (citation omitted). "[T]he requisite intent to defraud must exist at the time of conversion or appropriation of the property to defendant's own use" *People v. Artman*, 218 Mich. App. 236, 241, 553 N.W.2d 673 (1996). "The mere failure to pay over moneys belonging to another, without a felonious intent, is not embezzlement."

*Douglass*, 293 Mich. at 391; *Artman,* 218 Mich. App. at 241-42. "[C]oncealment or its absence, [or] refusal to pay . . . on demand . . . are not to be taken as declared essentials of the offense or defense but merely as circumstances bearing on the intent." *American Life Ins. Co. v. U.S. Fid. & Guar. Co.*, 261 Mich. 221, 224-25, 246 N.W. 71 (1933). "If property is converted without concealment, and under a bona fide claim of right, the conversion is not embezzlement, however unfounded the claim may be." *Douglass,* 293 Mich. at 391.

> The contrast between embezzlement and larceny is best summarized as follows:
>
> Larceny is different [from embezzlement] in that the original taking must have been unlawful, and is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner."

*Noblit*, 327 B.R. at 311 (quoting *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 166 (Bankr. N.D. Ohio 2003)). As noted by the court in *Morganroth & Morganroth, PLLC v. Stollman (In re Stollman)*, 404 B.R. 244, 271 (Bankr. E.D. Mich. 2009):

> [L]arceny can be defined as the actual or constructive taking away of property of another without the consent and against the will of the owner or possessor with the intent to convert the property to the use of someone other than the owner. Larceny for purposes of § 523(a)(4) requires proof that the debtor wrongfully and with fraudulent intent took property from its rightful owner. As distinguished from embezzlement, the original taking of the property must be unlawful. Larceny is commonly understood to be synonymous with theft. For example, larceny occurs when a thief breaks into a home and steals jewelry for the purpose of converting it to cash for his/her own use.

*Stollman*, 404 B.R. at 271 (quoting *General Motors Acceptance Corp. v. Cline*, No. 4:07cv2576, 2008 WL 2740777, at *4 (N.D. Ohio, July 3, 2008)).

<u>11 U.S.C. § 523(a)(6) - Willful and Malicious Injury</u>

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The United States Supreme Court has stated that a willful and malicious injury occurs only if "the actor intend[ed] 'the consequences

12

17-02120-dob    Doc 94    Filed 08/19/20    Entered 08/19/20 15:13:41    Page 12 of 18

of [the] act,' not simply 'the act itself'" and has held that debts arising from negligent or reckless conduct do not fall within the statutory exception. *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62, 64 (1998) (quoting Restatement (Second) of Torts § 8A cmt. a (1964)); *see also Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 581 (6th Cir. 2001) ("only acts done with the intent to cause injury - and not merely acts done intentionally - rise to the level of willful and malicious injury") (citing *Geiger*, 523 U.S. at 61). In the Sixth Circuit Court of Appeals, the standard for determining whether the actor intended to cause the injury for purposes of § 523(a)(6) is whether the actor 1) desired to cause the consequences of his or her act, or 2) believed that the consequences are substantially certain to result from the act. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999).

A willful and malicious injury "can be inferred through the circumstances surrounding the injury at issue." *O'Brien v. Sintobin (In re Sintobin)*, 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000) (citations omitted). However, the discharge exceptions are to be construed narrowly and in favor of the debtor. *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004) (citing *Meyers v. I.R.S. (In re Meyers)*, 196 F.3d 622, 624 (6th Cir. 1999)). "The party seeking the exception to discharge bears the burden of proof by a preponderance of the evidence." *Id.* at 306 (citing *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

Analysis

A.    Embezzlement or Larceny

    I.    Intent

Both embezzlement and larceny require a felonious or fraudulent intent (embezzlement) or an intent to convert property without consent of the owner (larceny). Both types of intent are based on an unlawful act that separates the property in question from its rightful owner. Each cause of

17-02120-dob    Doc 94    Filed 08/19/20    Entered 08/19/20 15:13:41    Page 13 of 18

action infers that this separation was not done accidently, but instead a willful act by the person who took the property.

Camp Inn's premise for embezzlement or larceny is sound in this case. If money was taken from the daily envelopes and packages, the testimony and exhibits all demonstrate that this money was Camp Inn's, and no one else. The record is devoid of any credible evidence that any money, if taken, was not Camp Inn's money. The Court finds no credible evidence that any missing money was accidentally lost, procured by mistake, or taken because Mr. Kirvan erroneously thought the money was his. From that finding, any Camp Inn money taken was done so with the requisite felonious or fraudulent intent as required by the elements of embezzlement or the intent to convert the money without Camp Inn's consent as required by the elements of larceny.

The Court finds that Camp Inn has met its burden of proof that if money was taken, it was taken by Mr. Kirvan with felonious or fraudulent intent to embezzle or intent to convert money with the consent of Camp Inn that constitutes larceny.

II. The timing of the taking.

As noted by *Noblit*, embezzlement addresses the situation where the property was originally entrusted to a person who had a lawful reason to have the money, with the unlawful act happening later. Larceny addresses the situation where the property was never lawfully in the wrongdoer's hands. In this case, to the extent Camp Inn's money was taken, Mr. Kirvan originally had a lawful reason to have this money. His job duties included the review of daily deposit reports and receipts, and Camp Inn entrusted these funds with Mr. Kirvan. If Mr. Kirvan later took Camp Inn's money, he did so sufficiently after the original lawful receipt of the money so as to constitute embezzlement, not larceny.

But to be clear, if the Court errs as to its determination that the timing of the taking constitutes embezzlement, then the Court finds that if any money was taken by Mr. Kirvan, then that taking is larceny.

B.  Willful and Malicious Injuries – Section 523(a)(6)

    I.  Intent

Section 523(a)(6) actions require that the actor intend the consequences of the act. Much like embezzlement or larceny actions, an accidental, negligent, or even reckless act alone will not suffice. Applied to this case, if any money was taken by Mr. Kirvan, he must have known that the taking of this money would have the consequence that Camp Inn would not have the money or the use of this money. There is no room for doubt that taking money from the daily envelopes and packages would cause Camp Inn to not have the benefits of this money, thus meeting the requirements of *Kawaauhau*, *Kennedy*, and *Markowitz*. The Court finds that Camp Inn has met its burden of proof as to intent as required by Section 523(a)(6).

C.  Injuries

So far, the Court's Opinion assumes, without finding, that Mr. Kirvan took money from Camp Inn. The Court now turns to that issue, which is common to all of the Section 523 actions. In doing so, the Court again notes that the initial burden of proof is on Camp Inn.

    I.  The lack of direct evidence and exhibits

Camp Inn's case is weakened by incomplete and scattered records. Many of the necessary daily business records to support its claim do not exist. Camp Inn argues that Mr. Kirvan destroyed these records to cover up his improper activities. Mr. Kirvan denies this accusation and counters with two points. First, the records were never kept in a secure location and any one of many people

could have destroyed these records. Second, if he did destroy records by putting the papers in a trash can in an open area, he would be foolish to do so when anyone could catch him in this act.

The result of all of this is that the Court cannot make a determination of which party has the better argument. What is unknown and results in a nagging question is why only papers regarding cash receipts are missing and no other papers. By a close margin, the Court finds this issue as proven by Camp Inn because the missing documents are connected to cash receipts. If Camp Inn kept poor records, that would spill over in other areas. Here, that is not true.

   II.   Indirect Evidence and Expert Testimony

Given the lack of a good record foundation, Ms. Scott was forced to reconstruct the financial condition of Camp Inn by indirect means and secondary sources. Ms. Scott is a qualified expert and has specialized knowledge to investigate embezzlement and fraud. Here, she utilized other means, including interviewing employees, reviewing bank statements and records, and reconstructing probable payments and cash receipts using what records were available. Her methods are within acceptable methods for these types of investigations. Mr. Kirvan did not produce testimony questioning her methods directly and offers no meaningful attack on her methods. Lacking this attack, the Court can factually rely on her opinions.

   III.   The weakness of the Room Master Program

Without hard foundational records, Ms. Scott had to use secondary and less reliable sources such as the Room Master Program. Mr. Kirvan rightfully criticizes the Room Master Program as an ill-advised tool to use to track room revenue. In many situations, the Room Master Program lagged the actual receipt of money. Mr. Kirvan is correct that this program was not used to track revenue and is unreliable. While he is correct up to a point, the Room Master Program does give enough detail to allow Ms. Scott to make certain projections. Also, her professional opinion is that

16

17-02120-dob    Doc 94    Filed 08/19/20    Entered 08/19/20 15:13:41    Page 16 of 18

while Room Master may be imperfect, it is sound enough to support her opinions. As experts can rely on these types of programs, the Court accepts her methodology and opinion, especially since Mr. Kirvan offers no countering expert testimony. *See United States v. Ramer*, 883 F.3d 659, 680 (6th Cir. 2018).

IV. The unexplained lifestyle of Mr. Kirvan

Camp Inn buttresses its case by pointing out that Mr. Kirvan had a lifestyle beyond his means. As this argument goes, Mr. Kirvan earned known income, incurred a set amount of known expenses and had certain undetermined routine expenses. When these numbers are reviewed, Mr. Kirvan did live beyond his known means. In reply, he claims he saved cash from the sale of personal property and that he earned additional income not reported on his tax returns. Even if true, the Court cannot accept the general blanket denials of Mr. Kirvan or condone the filing of false tax returns. Instead, the Court finds that Camp Inn has met its burden of proof that Mr. Kirvan lived beyond his means and that this money came from Camp Inn.

Reaching this conclusion has not been direct or easy. Pieces of Camp Inn's case are not strong, but those weak spots are supported by other pieces of evidence and the uncontroverted testimony of Ms. Scott. The Court notes Camp Inn has not vaulted over its burden of proof by a great distance and acknowledges that Mr. Kirvan raised good responses to facts offered by Camp Inn. But after examining the exhibits, listening to witnesses and watching their demeanor, the Court concludes that Camp Inn has met its burden of proof, albeit not as much as other plaintiffs may have.

Damages

Camp Inn also requests treble damages as allowed by MCL 600.2919a, which states:

(1) A person damaged as a result of either or both of the following may recover 3 times the amount of actual damages sustained, plus costs and reasonable attorney fees:

(a) Another person's stealing or embezzling property or converting property to the other person's own use.

(b) Another person's buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property when the person buying, receiving, possessing, concealing, or aiding in the concealment of stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted.

Here, the Court found that Mr. Kirvan did embezzle $55,847.45 from Camp Inn, so MCL 600.2919a applies. Moreover, the United States Supreme Court in *Cohen v. de la Cruz*, 523 U.S. 213 (1998) included an obligation to pay treble damages as part of an amount excepted from discharge under Section 523. The same is true here, so Camp Inn is entitled to the trebling of damages to $167,542.35. Of the other items of damages, Camp Inn will need to supply additional documentary support so the Court can review the appropriateness of these fees and costs. The Court allows Camp Inn 28 days to supply this information and Mr. Kirvan 28 days to respond. If need be, the Court will hold a hearing to explore this item of damages.

## Conclusion

For the reasons stated in this Opinion, the Court finds and concludes that Camp Inn has met its burden of proof as to its 11 U.S.C. § 523(a)(4) and (a)(6) claims. Camp Inn's damages total $55,847.45, and are trebled pursuant to MCL 600.2919(a). Camp Inn and Mr. Kirvan are allowed 28 days respectively to submit additional documents regarding fees and costs. Counsel for the Plaintiff is directed to prepare an order consistent with this Opinion and to submit that order as allowed by the Local Rules of this Court.

**Signed on August 19, 2020**



/s/ Daniel S. Opperman
**Daniel S. Opperman
United States Bankruptcy Judge**